# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DEBORAH H.,**[1]            ) | |
|            ) | |
|      **Plaintiff,**        ) | |
|            ) | |
| **vs.**            ) | **Case No. 3:21-cv-1195-DWD** |
|            ) | |
| **KILOLO KIJAKAZI, ACTING**   ) | |
| **COMMISSIONER OF SOCIAL**   ) | |
| **SECURITY,**            ) | |
|            ) | |
|      **Defendant.** | |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423 and 42 U.S.C. § 1383(c). For the reasons discussed below, the final agency decision is due to be affirmed.

## I.  Procedural History

In February 2019, Plaintiff filed her application for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act, alleging a disability onset date of June 2017. The Agency denied her claims initially on July 15, 2019, and on reconsideration on March 16, 2020. After holding an evidentiary hearing, an Administrative Law Judge ("ALJ") denied the application on February 11, 2021. The Appeals Council denied Plaintiff's request for review on July 28, 2021, making

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

the ALJ's decision the final agency decision subject to judicial review. Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## II.  Applicable Legal Standards

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.  An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. § 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. *See Craft v. Astrue*, 539 F.3d 668, 647, n.6 (7th Cir. 2008).  For convenience, most citations herein are to the DIB regulations.

significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Here, the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, the Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 148, 1150 (2019) (internal citations omitted).  In reviewing for "substantial evidence," the Court takes the entire administrative record into consideration but does *not* "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; the Court does not act as a rubber stamp for the Commissioner.  *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### III.  The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. At step one, she determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, and that she meets the insured status requirements of the SSA through December 31, 2022 (Tr. 18). Plaintiff was 42 years old on the alleged onset date (Tr. 26). At step two, the ALJ found that Plaintiff has the following severe

impairments: degenerative disc disease, obesity, bipolar disorder, major depressive disorder, and generalized anxiety disorder (Tr. 18). The ALJ also found that Plaintiff has the following non-severe impairments: hearing loss, headaches, and metatarsalgia of the right foot and associated pain (Tr. 18-19).

At step three, the ALJ found that Plaintiff does not have any impairments or combination of impairments that meet any of the listings (Tr. 19). The ALJ determined that the evidence does not show that Plaintiff has an inability to ambulate effectively. (Doc. 11, p. 23). The ALJ concluded that Plaintiff has only a mild limitation in her ability to understand, remember, and apply information. (Tr. 19). He found that Plaintiff has a mild limitation in her ability to interact with others. (Tr. 20).  The ALJ also concluded that Plaintiff has only a moderate limitation in her ability to concentrate, persist, or maintain pace. (Tr. 20). Finally, the ALJ found that Plaintiff has no limitations in her ability to adapt and mange herself. (Tr. 20).

Before proceeding to step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that:

> [S]he could occasionally pull and pull with the right lower extremity. She could sit, stand, and walk each up to 30-minutes at a time, for a total of up to six hours each in an eight-hour workday with normal breaks. She should never climb ladders, ropes, or scaffolds. She could frequently stoop, kneel, crouch, crawl, and climb ramps/stairs. She should avoid concentrated exposure to vibrations, unprotected heights, and dangerous machinery. She is able to understand, remember and carry out simple, 2-4 step instructions and tasks. She is able to maintain attention and concentration for two-hour segments over an eight-hour period and complete a normal workweek. She is able to interact appropriately with supervisors, co-workers and with the public. She is able to adapt to routine changes and appreciate hazards in a

4

work setting.

(Tr. 21).

At step four, the ALJ relied on the testimony of a vocational expert ("VE") to find that Plaintiff could not perform any of her past relevant work. (Tr. 26). However, at step five, the ALJ found that Plaintiff was not disabled because she was able to do other jobs that exist in significant numbers in the national economy. (Tr. 26).

## IV.  The Evidentiary Record

Plaintiff has completed her GED. (250, 282). She is divorced and lives alone but helps her mother with her daily activities. (Tr. 21, 48, 199, 250). Plaintiff's previous work experience includes working in a factory gutting fish, and self-employment as an in-home caregiver for her mother, babysitting, housekeeping, and styling hair. (Tr. 42-48, 707).

Plaintiff stopped working in 2017 due to her alleged disabilities, which include bilateral hearing loss, chronic neck and back pain, and difficulties associated with her history of surgery on her right foot. She also alleges disability based on the following mental impairments: bipolar disorder, schizophrenia, major depressive disorder, and anxiety. (Tr. 37-38, 234). Plaintiff's briefing does not allege error regarding the ALJ's evaluation as to her alleged hearing loss or bipolar disorder, or as to the ALJ's failure to expressly discuss her alleged schizophrenia.[3] Additionally, Plaintiff does not raise any issue regarding the ALJ's evaluation of her obesity.

---

[3] The ALJ found that Plaintiff has the following severe impairments: degenerative disc disease, obesity, bipolar disorder, major depressive disorder, and generalized anxiety disorder. The ALJ made no express findings regarding Plaintiff's alleged schizophrenia. Plaintiff notes that the ALJ found she suffers from bipolar disorder, but she does not otherwise discuss this impairment. Plaintiff's briefing includes no discussion of her alleged schizophrenia.

*Relevant Medical Records[4]*

**A.     Magnetic Resonance Imaging Results**

A January 2016 cervical spine Magnetic Resonance Imaging (MRI) revealed multilevel degenerative disc disease and mild central canal stenosis. (Tr. 635). A May 2017 lumbar spine MRI demonstrated multi-level degenerative changes with a lumbar disc protrusion (herniated disc), 2 nerve root displacement, central spinal canal stenosis, and thecal sac indentation. (Tr. 587-88.). In 2018, Plaintiff had an updated lumbar spine MRI. (Tr. 590-91). The findings showed worsening degenerative changes at L4-5 and L5-S1, along with a disc bulge/protrusion contacting a nerve root which was identified as a possible "source for pain/radiculopathy." (Tr. 590-91.)

**B.     G. Wong, M.D. – Primary Care Provider**

Treatment notes from G. Wong, M.D., Plaintiff's primary care provider, document a history of ongoing radiating back and neck pain. (Tr. 375-95, 405-09, 417-24, 416-61, 481-529, 556-72, 763- 811, 875-902). Plaintiff consistently described the pain as being severe. *Id.* Plaintiff received a range of treatments including injections, use of a TENS unit, physical therapy, and narcotic pain medications such as hydrocodone. *Id.* Treatment notes further indicate that Plaintiff's ongoing pain was aggravated by activities such as sitting and walking. (Tr. 499, 506). It also interfered with her sleep. (Tr. 497, 529, 556). In 2016, Dr. Wong diagnosed Plaintiff with chronic pain syndrome and a protrusion of the intervertebral disc of lumbosacral region. (Tr. 391, 393, 409, 424, 444, 525, 881). Dr. Wong

---

[4] The medical records summary focuses on the impairments addressed in Plaintiff's briefing.

also referred Plaintiff to a neurosurgeon at that time. (Tr. 391).

In September 2020, Dr. Wong completed a Treating Source Statement. (Tr. 909). He indicated that Plaintiff's diagnoses included a herniated lumbar disc, neck pain, and chronic right sided low back pain with sciatica. (Tr. 909). He opined that Plaintiff could occasionally lift ten pounds; never lift twenty pounds; and could sit, stand, and walk less than one hour each in an eight-hour day (Tr. 25, 909-12). He also opined that Plaintiff would need to lie down or recline during the day, required an at will sit/stand option, would need to use a cane or walker "at least sometimes," would have limitations on the use of her hands and feet, and had some postural and environmental limitations. (Tr. 25, 909-12). In addition, he concluded that, due to her symptoms, Plaintiff would likely be off task more than twenty-five percent of a workday, would miss than four days monthly, and could not sustain attention or concentration. (Tr. 909-12). As to why Plaintiff would require an assistive device, "at least sometimes," Dr. Wong wrote: "see MRI report." (Tr. 911). He did not specify which MRI report or provide any additional detail. He also did not provide any additional detail regarding limitations on her attention or concentration.

## C.   Leslie Kathryn Rao, M.D. and Justin Choi, M.D. – Pain Management Specialists

In 2018, Dr. Wong referred Plaintiff to pain management specialist Leslie Kathryn Rao for evaluation. (Tr. 637). The medical notes were completed by Dr. Justin Choi, M.D., a resident working with Dr. Rao. (Tr. 641). It appears that Plaintiff was evaluated by both Dr. Choi and Dr. Rao. (Tr. 641).

Dr. Choi indicated that Plaintiff presented with chronic right sided back pain with an unknown onset. (Tr. 638). Plaintiff indicated that, at its best, the pain is a five on a scale

of ten, and at its worst a nine on a scale of ten. (Tr. 638). Plaintiff reported that lifting, bending, lying, standing, and sitting provoked her pain. (Tr. 638).

Dr. Choi's notes indicate that Plaintiff's pain did not interfere with her activities of daily living. (Tr. 638). He observed worsening degenerative changes at L4-5 and L5-S1 compared to May 2017. (Tr. 639). He also observed antalgic gait and positive lumbar facet loading. (Tr. 640). As to her neurological examination, Dr. Choi found that cranial nerves II-XII were grossly normal and that her balance was normal. Dr. Choi concluded that treatment with opioids was not indicated. (Tr. 641). Instead, Dr. Choi recommended injections and a gabapentin titration schedule. (Tr. 641).

**D.    Lisa Arnold Nurse Practitioner**

Plaintiff was referred to the Brain and spine Institute regarding her low back pain. (Tr. 643). She was evaluated by Lisa Arnold, a nurse practitioner. During this visit, Plaintiff reported that her back pain is aggravated by prolonged sitting or standing greater than ten minutes and by walking. (Tr. 643). The practitioner indicated that "[Plaintiff was] neurologically intact other than slightly decreased right Achilles reflex." (Tr. 645). She further noted that her tandem, heel, and toe walking were unremarkable. (Tr. 645). She was given prescriptions for Meloxcam and Tizanidine. She was instructed to stop taking Ibuprofen and Flexeril. (Tr. 645).

**E.    Brandon Scott D.O., Neurosurgery Consult**

In July 2020, Plaintiff was examined by neurosurgeon, Brandon Scott, D.O. (Tr. 905). During the examination, Plaintiff described her pain was moderate aching and burning, and she rated her pain as being a seven out of ten. (Tr. 905). Dr. Scott noted that

Plaintiff had no weakness in her upper or lower extremities and no difficulty walking. (Tr. 905). Dr. Scott also noted Plaintiff's MRI revealed advanced degenerative disc disease at L4-5 and L5-S1. (Tr. 907). Dr. Scott informed Plaintiff that, because previous conservative treatments had failed, her next option would be lumbar fusion surgery. (Tr. 907). Plaintiff stated she was not interested in surgery and requested pain medication modifications. (Tr. 907). Dr. Scott explained that his office does not prescribe pain medications. (Tr. 907). He then indicated that no follow-up would be necessary. (Tr. 907).

F.   **Family Counseling Center Community Health Emergency Services Mental Health Records**

Plaintiff received mental health treatment at the Family Counseling Center and Community Health and Emergency Services. Those treatment notes document a history of anxiety, anxiety attacks, depression, mood swings, disheveled appearance, slumped posture, constricted affect, depressed and anxious mood, good and bad days, frustration, isolative behavior, irritability, crying spells, anger, paranoia, a racing mind, bipolar disorder, and sleep problems. (Tr. 681-97, 727-38, 746-52, 849-61). These records also periodically reference a diagnosis of schizophrenia spectrum disorder. (Tr. 680-697, 734, 736, 739, 740, 744). It is not entirely clear if the references to schizophrenia spectrum disorder reflect a particular provider's medical opinion, as opposed to a restatement of what Plaintiff told the provider. However, the providers at these facilities consistently indicate that, at the time of the evaluation, Plaintiff was not suffering from delusions or hallucinations and/or that Plaintiff denied that she was suffering delusions or hallucinations. (Tr 680-697, 734, 742, 743, 747, 851, 858, 859).

Treatment records further indicate that Plaintiff was struggling with the death of her granddaughter, who was murdered in 2017, and with the death of another family member who committed suicide a few days before her granddaughter was killed. (Tr. 727-28, 744, 736). The treatment notes reflect concerns regarding misuse of medication including the following: (1) In July 2019, Plaintiff received prescriptions for opiates from two different physicians; (2) a history of requesting early refills for Xanax, including requesting an early refill after reportedly losing her prescription bottle while at a club; and (3) running out of Klonopin ten days early and requesting Xanax instead. (Tr. 740-752).

### G.    Orthopaedic Institute of Western Kentucky and Southern Illinois Orthopaedic Center

Plaintiff's orthopaedic medical records show that Plaintiff has had multiple right foot surgeries. (Tr. 345-374, 754-62, 816-31, and 913-931). In June 2016, Plaintiff completed the following procedures: (1) right foot excision of intractable plantar keratosis plantar aspect right great toe; (2) right great toe metatarsophalangeal joint capsular release; and (3) Moberg/akin osteotomy of right great toe proximal phalanx.  (Tr. 345). She then had a revision surgery in August 2017. (Tr. 347).

In May 2018, Plaintiff returned for a follow-up visit, she reported that her right foot was feeling better, and the provider concluded she had a reasonable range of motion. (Tr. 351-52). In November 2019, Plaintiff reported right foot pain again and was diagnosed with metatarsalgia of the right foot. (Tr. 754-57). Plaintiff completed a right second metatarsal osteotomy procedure in December 2019. (Tr. 758). Medical notes from

follow-up visits, indicate that the operation was "[v]ery successful," and that Plaintiff reported limited or no pain. (Tr. 821, 824, 919, 922) (Plaintiff's pain described as "well controlled"; Plaintiff reported experiencing "almost no pain"; physician indicated that Plaintiff was "[n]ot having much pain at all"). Notes from Plaintiff's final follow-up visit in July 2020 state as follows:

> On examination, the wound is well healed. The stitches are removed. There is a little bit of thickening of the skin, but no apparent recurrence of the callus. She has excellent range of motion of the great toe. It is stiff compared to the contralateral side; however, it is better than it was preop.

(Tr. 926).

### *Agency Reports*

**A.    D. York Anderson, Ph.D.**

D. York-Anderson, Ph.D., examined Plaintiff for the Agency, performing a mental status evaluation. (Tr. 701). Plaintiff reported struggling to cope with her granddaughter's murder, including experiencing flashbacks of seeing her granddaughter on blood-soaked sheets at the hospital. (Tr. 701). She also reported problems with eating, sleeping, and anger, as well as feelings of sadness, isolating behavior, rapid mood swings, and agitation. (Tr. 701, 703-04). When questioned about her ability to do daily tasks, Plaintiff claimed that she had difficulty standing more than twenty minutes continuously or sitting more than fifteen minutes. (Tr. 702). During her evaluation, she became tearful and had a depressed mood. (Tr. 703-04). Her recent and remote memory was described as "adequate," and her immediate memory was described as "good." (Tr. 703). She was able to repeat six digits forward and four digits backwards, correctly spell a five-letter

11

word forward and backward, and accurately calculate orally presented word problems for addition, subtraction, multiplication, and division. (Tr. 703). She was unable to do serial sevens. (Tr. 703).

Dr. York-Anderson did not observe any hallucinations, delusions, racing thoughts, psychotic behavior, or delusional thinking. (Tr. 703-04). Her speech was described as "clear coherent, logical, goal-directed, and relevant." (Tr. 704). Dr. York-Anderson opined that Plaintiff was suffering from persistent complex bereavement disorder, and that, if benefits were provided, she might need assistance with managing those benefits. (Tr. 704).

**B.  Howard Tin, Psy.D.**

In June 2019, Howard Tin, Psy.D., reviewed the record for the Agency. (Tr. 83-84). Dr. Tin opined that Ms. Hill had a non-severe mental impairment. (Tr. 84). Dr. Tin indicated that Plaintiff's statements regarding her mental health were inconsistent with her activities of daily living, her most recent assessments, and other data in the medical record. (Tr. 84). He indicated that Plaintiff's activities of daily living and mental state examination were not severely impaired. (Tr. 84). He also opined that her allegation of the severity of her disorder was not consistent with her ability to function generally well from day to day. (Tr. 84).

**C.  Lionel Hudspeth, Psy.D.**

State agency psychological consultant, Dr. Lionel Hudspeth, Psy.D., reviewed the record for the Agency. (Tr. 110-112, 115-17). At the reconsideration level, Hudspeth opined Plaintiff had mild limitations in understanding, remembering, or applying

information and interacting with others; as well as moderate limitations in concentrating, persisting, or maintaining pace. (Tr. 115-17). Considering these limitations, he opined that Plaintiff had "sufficient cognitive, memory and thought processing skills to retain the ability to understand, remember and carry out at least two to four step simple tasks" and that Plaintiff "demonstrated the ability to carry out all of the typical daily tasks of adult, independent living." (Tr. 117). As to Plaintiff's statements regarding her alleged disabilities, Dr. Hudspeth concluded as follows:

> [Plaintiff's] statements are partially consistent as allegation of disability is inconsistent with the [activities of daily living], the most recent assessment(s) and other data in the medical record. Claimant has diagnosis of depression and anxiety by history. Claimant is prescribed psychotropic medication(s), according to the information found in the Case Data section in file, for depression and anxiety. [Plaintiff's] allegations of the severity of the disorder is not consistent with claimant's ability to function generally well from day to day.

(Tr. 112).

### D.   Charles Kenney, M.D.,

Charles Kenney, M.D., reviewed the record for the Agency. (Tr. 113-15). Dr. Kenney opined that Plaintiff could perform light work with exertional limitations and that she was capable of frequently kneeling, crouching, crawling, and climbing ramps or stairs. (Tr. 113-15). He opined that Plaintiff could stand and/or walk, with normal breaks, for about six hours in an eight-hour workday, and that she could sit, with normal breaks, for a total of about six hours in an eight-hour workday. (Tr. 114). He indicated that Plaintiff had normal ambulation, was able to ambulate at least fifty feet, and had a negative straight leg test. (Tr. 115). Although Plaintiff forgot to bring her hearing aid to

the examination, Dr. Kenney reported she was able to hear and respond to conversation without difficulty. (Tr. 115). There is no indication that Plaintiff utilized a cane during her consultation with Dr. Kenney.

**E.     Dr. James Madison, M.D.**

James Madison, M.D., reviewed the record for the Agency. (Tr. 85-87). Dr. Madison opined that Plaintiff could perform light work with exertional limitations and that she was capable of frequently kneeling, crouching, crawling, and climbing ramps or stairs. (Tr. 85-87). He opined that Plaintiff could stand and/or walk, with normal breaks, for about six hours in an eight-hour workday, and that she could sit, with normal breaks, for a total of about six hours in an eight-hour workday. (Tr. 85). He further indicated that Plaintiff had normal ambulation, was able to ambulate at least fifty feet, and a negative straight leg test. (Tr. 86). There is no indication that Plaintiff utilized a cane during the examination. In addition, Plaintiff did not bring her hearing aids to the consultation. (Tr. 86). However, Dr. Madison found she was able to hear and respond to conversation without difficulty. (Tr. 86).

**F.     Dr. Adrian D. Feinerman, M.D.**

A. Feinerman, M.D., examined Plaintiff, noting she has a history of back and neck pain caused by Degenerative Disc Disease. (Tr. 708).[5] He also noted that Plaintiff reported her low back pain is the problem that most interferes with her ability to work. (Tr. 708,

---

[5] In her briefing, Plaintiff states that Dr. Feinerman noted her "inability to stand for more than fifteen minutes at a time or sit more than twenty minutes continuously." (Doc. 13, p. 5). Dr. Feinerman, however, did not conclude that Plaintiff could not stand for more than fifteen minutes at a time or sit more than twenty minutes continuously. Rather, Dr. Feinerman's report indicates that Plaintiff self-reported these limitations.

713). Plaintiff told Dr. Feinerman that she was diagnosed as schizophrenic and that she suffers from paranoia and mood swings. (Tr. 713). Dr. Feinerman indicated that Plaintiff could ambulate 50 feet normally, without an assistive device; carry on a normal conversation without hearing aids; and could "sit, stand, walk, speak, lift, carry, handle objects, and handle funds on her own behalf." (Tr. 712-13). Dr. Feinerman also reported that Plaintiff was unable to stand on her toes and had moderate difficulty with squatting and arising. (Tr. 712.)

### *Evidentiary Hearing*

An evidentiary hearing was held on October 28, 2020. (Tr. 32-77). During the hearing, Plaintiff indicated she was using a cane "all the time now" to keep the weight off her foot, and she said she had been using the cane for about three months. (Tr. 52-54). She said uses a motorized cart when she goes to the grocery store. (Tr. 54). She estimated she can only stand for 15-20 minutes before she needs to sit down and believes she would need the option to lay down or recline during an eight-hour workday. (Tr. 58-59).

Plaintiff described her back and neck pain as being constant and severe. (Tr. 52-53). She occasionally uses a TENS unit to relieve her pain, but it only gives her some relief. (Tr. 52). She takes a muscle relaxer, and occasionally smokes marijuana to relieve the pain. (Tr. 52, 65-66). Her physician has recommended she undergo back surgery to address her pain. (Tr. 53). But before proceeding with surgery, she would like "them to fix [her] foot." (Tr. 53). Accordingly, as of the date of the hearing, she had declined to proceed with the recommended surgery and was "looking at" having another foot surgery. (Tr. 53).

Plaintiff provided testimony regarding her mental health impairments. The

mental health issues that interfere with Plaintiff's ability to work include: (1) inability to sleep because of intrusive thoughts related to her granddaughter's murder; (2) bipolar disorder which causes unpredictable emotions; (3) schizophrenia which causes her to hear voices and see things that are not there; (4) anxiety; (5) depression; and (6) panic attacks. (Tr. 57-58). At the time of the hearing, she was taking Lexapro, Xanax, and Seroquel to treat her mental health impairments. (Tr. 39-40).

Plaintiff also provided testimony regarding her daily activities, including caring for her mother. She spends two to three hours a day caring for her mother. (Tr. 60). She makes her breakfast, lunch, and dinner; handles her morning and evening medication; bathes her; and transports her to and from medical appointments. (Tr. 42-43, 49, 59-60). Taking care of her mother involves a combination of sitting, standing, and walking. (Tr. 42-43). In between tasks, she lays down to rest. (Tr. 60). She also acknowledged that, in the past, she moved her mother, lifted her, and moved furniture. (Tr. 64). When asked whether she continues to perform these tasks, Plaintiff indicated her mom is "doing more by herself now." (Tr. 64).

When she is at home, she handles all the housework herself. (Tr. 60). She does not have any problems completing her chores, and she makes sure "nothing's dirty." (Tr. 60). She also transports herself to and from medical appointments. (Tr. 64). She gets headaches two to three times per week. (Tr. 68). Plaintiff uses over-the-counter pain medication to treat her headaches and lies down until she feels better. (Tr. 67-68).

Otis Pearson, a Vocational Expert ("VE") also testified at the hearing (Tr. 34). He considered two hypothetical individuals. The first, hypothetical was for employment "in

the light range," with the following limitations:

> Lift and carry up to 20 pounds occasionally, ten pounds frequently.
>
> Sit, stand, and walk each up to 30 minutes at a time for a total of up to six hours each in an eight-hour day with normal breaks.
>
> [J]obs that can accommodate changing of position for whatever reason. And that don't rely on the coworkers around them for them to maintain the same position.
>
> Sit, stand, and walk each up to 30 minutes at a time for a total of up to six hours each in an eight-hour day.
>
> [N]ever climb ladders, ropes, or scaffolds.
>
> [F]requently climb ramps and stairs. Frequently stoop, kneel, crouch, crawl.
>
> Avoid concentrated exposure to vibration, unprotected heights, dangerous machinery.
>
> Occasionally push, pull with…the right lower extremity. Only occasional use of the right lower extremity.
>
> [Ability] to understand, remember, and carry out simple two to four-step instructions and tasks, maintain attention and concentration for two-hour segments over an eight-hour day, and complete a normal work week.
>
> [Ability] to interact appropriately with supervisors and coworkers and the public. Able to appreciate hazards in work setting.
>
> Able to adapt to routine changes in work setting.

(Tr. 72-73). The VE testified that this hypothetical person would not be able to perform Plaintiff's past work. (Tr. 73-74).  However, the hypothetical person could perform light, SVP positions such as office helper, mail clerk, or ticket seller. (Tr. 74).

Next, the VE considered the same hypothetical person but with further limitations provided by Plaintiff's attorney, including allowing the individual to be off task 25% of

the workday on a sustained basis, to be absent from work four or more days per month on a sustained basis, and to lay down and recline an additional 30 minutes outside of the normal breaks during an eight-hour workday. The VE testified that this hypothetical person would not be able to work. (Tr. 74-75).

The ALJ ultimately crafted Plaintiff's RFC using limitations consistent with the first hypothetical person. (Tr. 21).

## V.  Analysis

Plaintiff makes three arguments in support of reversal of the Commissioner's decision. Plaintiff first argues that the RFC is not supported by substantial evidence because it (1) omits, without a supportive basis, Plaintiff's need to use a cane; (2) fails to provide substantial support for the finding that Plaintiff would only need to change positions every thirty minutes; (3) does not account for opinions of treating physician Dr. Wong; and (4) did not include any concentration, persistence, or pace limitations. Second, Plaintiff argues that the ALJ failed to set forth a legally sufficient symptom evaluation. Finally, Plaintiff argues that the structure of the Social Security Administration is unconstitutional, a fact which would invalidate the decision of the ALJ. The Court will consider each of these arguments in turn.

### A.    The RFC

At the evidentiary hearing, Plaintiff testified that she had been using a cane for approximately three months to "keep the pressure off [her] right foot." (Tr. 52). She indicated that she was using a cane "all the time now." (Tr. 53). She also testified that when shopping she uses a motorized cart. (Tr. 54). Plaintiff's treating physician, Dr.

Wong, opined that Plaintiff would need to use a cane or walker "at least sometimes." (Tr. 25, 909-12). As to why Plaintiff would require an assistive device, "at least sometimes," Dr. Wong wrote: "see MRI report." (Tr. 911).

The ALJ rejected Plaintiff's need for a cane: "The use of a cane is not supported by the objective evidence, and [Plaintiff] retains the capacity to help care for her mother on a regular and consistent basis." (Tr. 23). Plaintiff contends the ALJ did not adequately explain why Dr. Wong's opinion regarding use of a cane or assistive device was unsupported by the evidence, and he did not properly explain why she rejected Plaintiff's own testimony regarding her need to use a cane.

An ALJ is required only to "minimally articulate" her reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ met the minimal articulation standard

First, as noted by the Commissioner, all Dr. Wong offered in support of his opinion that Plaintiff required an assistive device "at least sometimes" was a singular note: "see MRI report." (Tr. 911). Dr. Wong did not provide any additional information as to the basis for this conclusory opinion. Second, The ALJ acknowledged Dr. Wong's opinion but found that it was not supported by the objective evidence in the record. For instance, when evaluating Plaintiff's spine disorder and the alleged need for a cane, the ALJ explained as follows:

> [T]here is no evidence of nerve root compression causing significant motor, sensory, or reflex loss. Several physical exams have documented full muscle strength, intact sensation, normal reflexes, and a negative straight leg raise

> test. Furthermore, the claimant testified that she has been using a cane for the last three months, but there is no indication that this has been prescribed. At a neurosurgeon office visit in July 2020, the neurosurgeon noted that the claimant has no weakness in her upper or lower extremities and no difficulty walking. He also indicated that no brace was needed. Therefore, the evidence does not show that the claimant has an inability to ambulate effectively.

(Tr. 19) (citations omitted). The ALJ also explained that the lack of significant muscle strength loss in the record and her conservative course of treatment did not support the allegation that Plaintiff needed a cane or assistive device:

> Overall, the record shows that the claimant has had minimal specialized lumbar treatment since the end of 2018, other than one neurosurgeon office visit in July 2020 where she declined to proceed with surgery. Exams throughout the record document no significant weakness in the upper or lower extremities, along with intact sensation, reflexes, and motor function.

(Tr. 23). Finally, Plaintiff's testimony that she had been using a cane for the past three months is not sufficient to warrant such a restriction in her residual functional capacity assessment. *Joseph M. v. Saul*, 2019 WL 6918281, at *12 (N.D. Ill. Dec. 19, 2019) ("That an individual may use a cane does not necessarily warrant a corresponding RFC restriction. Rather, to justify a cane RFC restriction, the individual must show that a cane is a medical necessity, and under which circumstances the cane is medically necessary."). Here, Plaintiff has not presented any evidence documenting that use of a cane is a medical necessity, and the ALJ sufficiently supported her conclusion as to Plaintiff's use of a cane. Accordingly, the ALJ's decision not to include a cane RFC restriction was not erroneous.[6]

---

[6] Plaintiff also contends the ALJ erred because she did not include a cane or assistive device in her hypothetical to the vocational expert. "As a general rule, both the hypothetical posed to the vocational expert and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). As set forth by the ALJ and for reasons set forth herein, the medical record did not

Plaintiff also claims the ALJ failed to provide support for her finding that Plaintiff would only need to change positions every thirty minutes. Plaintiff notes that her treating physician, Dr. Wong, opined she would need to change positions at will. (Tr. 909-912). Dr. Wong also concluded Plaintiff would need to lie down or recline during the day. (Tr. 909-912). The ALJ, however, found that Dr. Wong's opinion was not persuasive because the objective evidence in the record did not support this degree of limitations. (Tr. 25). The ALJ specifically noted that the objective evidence did not show that Plaintiff had significant neurological deficits or that she exhibited muscle strength loss. (Tr. 25). Further, in adopting the thirty-minute sit/stand/walk option, the ALJ first discussed the medical findings of state agency medical consultants, Drs. James Madison, M.D. and Charles Kenney, M.D. (Tr. 25). Both consultants found that Plaintiff could perform light exertional work with frequent kneeling, crouching, crawling, and climbing ramps and stairs. The ALJ found their conclusions to be persuasive and supported by the objective medical evidence. (Tr. 25).  Neither consultant imposed a sit/stand/walk limitation. Nonetheless, the ALJ concluded that an additional limitation was appropriate given Plaintiff's pain and disc degeneration, explaining as follows:

> [The opinion of the state agency medical consultants] is generally persuasive because the ability to perform light exertional work is consistent with and supported by the previously discussed evidence. However, to account for her symptoms of pain and lumbar degeneration seen on her MRI, the undersigned is persuaded that the claimant has additional limitations involving only occasional pushing/pulling with the right lower extremity, in addition to a 30-minute sit/stand/walk option.

support this limitation. Accordingly, it was not error to exclude it from the hypothetical given to the VE.  In addition, Plaintiff's objection simply repeats her challenge to the RFC. Accordingly, the Court need not address it separately. *Wurst v. Colvin*, 520 Fed. Appx. 485, 489 (7th Cir. 2013) ("But the hypothetical was based on the ALJ's RFC determination, so [claimant's] objection only repeats his challenge to the RFC.").

(Tr. 25). Considering the above, the Court finds that the ALJ sufficiently explained why Dr. Wong's opinion was not persuasive and why the challenged limitation was warranted.

The ALJ determined that Plaintiff had moderate limitations in concentration, persistence, or pace. (Tr. 20). In reaching this determination, the ALJ considered Plaintiff's reported activities of daily living (Tr. 20, 262-70, 32-77); office treatment records from the Family Counseling Center (Tr. 20, 649-97, 723-53); and Dr. Dollean York-Anderson's consultative examination report (Tr. 20, 701-06). Plaintiff contends that the ALJ failed to include any concentration, persistence, or pace limitations in her RFC assessment. This is inaccurate. The RFC included the following limitation:

> [Plaintiff] is able to understand, remember and carry out simple, 2-4 step instructions and tasks. She is able to maintain attention and concentration for two-hour segments over an eight-hour period and complete a normal workweek.

(Tr. 21).

As explained by the ALJ, this limitation is consistent with state agency psychological consultant, Dr. Lionel Hudspeth's, findings. (Tr. 25, 115-17). Dr. Hudspeth found that Plaintiff had mild limitations in understanding, remembering, or applying information and interacting with others; as well as moderate limitations in concentrating, persisting, or maintaining pace. (Tr. 25, 115-17). Dr. Hudspeth further opined as follows:

> [Plaintiff] has MER indicating sufficient cognitive, memory and thought processing skills to retain the ability to understand, remember and carry

> out at least two to four step simple tasks. There are no indications in the file [Plaintiff] would not be capable of learning a route to a worksite. There is no significant current MER in file to indicate [Plaintiff] would have significant social functioning issues within a work environment. [Plaintiff] has demonstrated the ability to carry out all of the typical daily tasks of adult, independent living.

(Tr. 117). The ALJ found this opinion persuasive, noting it was supported by the objective medical evidence. (Tr. 25). Accordingly, to accommodate Plaintiff's limitations in each of the four "B criteria," the ALJ limited Plaintiff to maintaining concentration, persistence, or pace for "two-hour segments over an eight-hour period." (Tr. 25).[7]

Finally, Plaintiff contends that the record supports the need for additional work restrictions. In support of this argument, Plaintiff cites only to Dr. Wong's opinion. As previously discussed, however, the ALJ found Dr. Wong's opinion was not persuasive because the objective evidence in the record did not support the degree of limitation proposed by Dr. Wong. Further, the ALJ sufficiently articulated her reasons for rejecting Dr. Wong's opinion.

## B.    Legally sufficient evaluation of Symptoms

Plaintiff contends the ALJ failed to set forth a legally sufficient evaluation of Plaintiff's symptoms. In connection with this argument, Plaintiff claims that the ALJ erroneously relied on the fact that Plaintiff assists her mother with daily activities and that Plaintiff declined back surgery.

---

[7] Plaintiff also argues that the ALJ's determination indicates Plaintiff could perform tasks at a "rapid pace," and would be able to meet "any quota demands." No such criteria were included in the RFC, and it is unclear how Plaintiff arrived at this interpretation.

23

An ALJ must make a residual functional capacity determination based on the entire medical record and after considering all relevant medical and other evidence, including Plaintiff's subjective symptoms. *See* 20 C.F.R. § 404.1546(c); 20 C.F.R. § 404.1529(c)(3). The ALJ's analysis of Plaintiff's subjective symptoms must be upheld unless it is "patently wrong." "[P]atently wrong … means that the decision lacks any explanation or support." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (citation omitted).

Here, the ALJ determined that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence in the record. (Tr. 22). In reaching this conclusion, the ALJ considered Plaintiff's daily activities, including Plaintiff consistently helping her mother. As to the tasks Plaintiff performed when helping her mother, the ALJ noted the following:

> [Plaintiff] reported in her function report that she has no problems attending to her own personal care needs. She also testified that she helps her mother with her personal care needs, as well as feeding her, helping her with medication, and taking her to appointments. She stated that she spends two to three hours per day helping her mother.

(Tr. 20).

> [Plaintiff] states that she lives alone, but helps her mother with daily activities, such as feeding her, helping with her hygiene, giving her medicine, and driving her to appointments. She says that she spends two to three hours per day helping her.

(Tr. 21).

> At a March 2017 primary care office visit, [Plaintiff] reported that she has been helping her mother, including lifting her.

(Tr. 22).

24

Here, substantial evidence supports the ALJ's evaluation of Plaintiff's self-reported activities of daily living, as well as the ALJ's conclusion that Plaintiff's symptoms are not as debilitating as she claims. The ALJ sufficiently assessed Plaintiff's daily activities in relation to her symptoms and adequately explained the inconsistencies between those activities and her allegations (for instance, that Plaintiff's stated use of a cane was not entirely consistent with the daily care she provided to her mother). Further, the ALJ considered these activities as part of her overall assessment regarding Plaintiff's subjective symptoms – not as conclusive proof that Plaintiff was able to work. Accordingly, this is not a "case where the ALJ equated daily activities with a capacity to hold down a full-time job." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). Considering the above, the Court finds the ALJ's symptom assessment was not patently wrong. *See Ray v. Saul*, 861 F. App'x 102, 107 (7th Cir. 2021) ("Because the ALJ's weighing of [claimant's] reported symptoms in the context of the whole record is supported by substantial evidence, we find no reversible error on this front either.").

The Court also finds no reversable error as to the ALJ considering Plaintiff's conservative treatment and her decision not to proceed with back surgery. The ALJ correctly noted that Plaintiff declined back surgery. (Tr. 23, 893, 907). At the administrative hearing, Plaintiff testified she declined the recommended back surgery because she wanted to resolve her foot pain first. She further indicated she was "looking at" having another foot surgery.[8] The the medical record reflects that, when the

---

[8] The medical record does not indicate that Plaintiff was seeking follow-up foot surgery.

25

neurosurgeon recommended surgery, Plaintiff declined, stating that she would prefer a medication modification. (Tr. 907). The neurosurgeon explained that his office does not prescribe pain medication, and concluded his notes by stating, "No follow-up is needed." (Tr. 907). Considering the evidentiary record, it was not error for the ALJ to consider Plaintiff's conservative treatment when evaluating the alleged severity of her symptoms. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (upholding finding based in part on "relatively conservative" treatment); *Chestine G. v. Saul*, 2020 WL 1157384, *4 (N.D. Ill. Mar. 10, 2020) ("The ALJ reasonably relied on [Plaintiff's] conservative treatment and did not err by viewing [Plaintiff's] conservative treatment as inconsistent with pain so severe that it rendered her unable to work.").

## C.   Separation of Powers

Finally, Plaintiff argues that the structure of the Social Security Administration is constitutionally defective. She relies on the Supreme Court's ruling in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020). In *Seila Law*, the Supreme Court held that Congress could not limit the President's ability to remove the Director of the Consumer Financial Protection Bureau without cause. 140 S. Ct. at 2197. Plaintiff argues that the ruling in *Seila Law* also applies to 42 U.S.C. § 902(a)(3), which limits the President's ability to remove the Commissioner of the Social Security Administration without cause. According to Plaintiff, this alleged unconstitutionality would invalidate the ALJ's ruling regarding Plaintiff.

The Commissioner agrees that 42 U.S.C. § 902(a)(3) is unconstitutional to the extent that it limits the President's ability to remove the Commissioner without cause.

26

(Doc. 29 at 2). However, as the Supreme Court explained in *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021), a constitutional defect in the President's ability to *remove* an agency director does not undermine the authority of actions taken by a properly *appointed* director. In *Collins*, that means that there was "no basis for concluding that any head of the [agency] lacked the authority to carry out the functions of the office." *Id.* at 1788. The same logic applies to decisions rendered by ALJs appointed by the Commissioner of the Social Security Administration. *See id.* at 1802 (Kagan, J., concurring in part and concurring in the judgment) ("But given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone."). Because Plaintiff has failed to demonstrate any connection between the limitation on the President's removal power and the denial of her application for disability benefits, this argument fails.

## V.  Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**. The Clerk of Court is directed to enter judgment in favor of Defendant.

SO ORDERED.

Dated: March 31, 2023

DAVID W. DUGAN
United States District Judge